Bennett, Giuliano, McDonnell & Perrone, LLP
Attorneys for Plaintiff
FLAME S.A.
494 Eighth Avenue, 7th Floor
New York, New York 10001
Telephone:   (646) 328-0120
Facsimile:    (646) 328-0121
William R. Bennett, III (WB 1383)
wbennett@bgmplaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
FLAME S.A.,

                 Plaintiff,

     -against-

PRIMERA MARITIME (HELLAS) LIMITED,

                 Defendant.
----------------------------------------------------------------X

09-CV-



RECEIVED
SEP 23 2009
U.S.D.C. S.D.N.Y.

VERIFIED PETITION TO
ENFORCE FOREIGN
JUDGMENT PURSUANT TO
UNIFORM FOREIGN
MONEY-JUDGMENTS
RECOGNITION ACT

        Plaintiff, FLAME S.A., by its attorneys, Bennett, Giuliano, McDonnell & Perrone, LLP,

for its Petition to Enforce Foreign Judgment pursuant to Uniform Foreign Money Judgments

Recognition Act codified in Article 53 of New York's C.P.L.R., in favor of FLAME S.A. and

against PRIMERA MARITIME (HELLAS) LIMITED, states as follows:

        1.      This is a case within the Court's admiralty and maritime jurisdiction pursuant to

28 U.S.C. §1333, and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure.

        2.      At all times hereinafter mentioned, Plaintiff, FLAME S.A., (hereinafter referred

to as "Flame"), was, and now is, a corporation or other business entity duly organized and

existing under and by virtue of the laws of Switzerland, with an office and principal place of

business in Switzerland.

3. Upon information and belief, at all times hereinafter mentioned, defendant PRIMERA MARITIME (HELLAS) LIMITED ("Primera"), was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign country, with an office and principal place of business at 106 Ag.Orous Street, 185 46 Piraeus, Greece, and is registered and authorized to conduct business in the State of New York as a foreign business corporation and has appointed a registered agent to accept service of process.

4. On or before September 11, 2008, Flame and Primera entered into a maritime contract called a Forward Freight Swap Agreement (hereinafter referred to as the "Agreement"). *Attached hereto as Exhibit 1 is the Forward Freight Swap Agreement.*

5. Primera failed to make the requisite payments under the Agreement. The sum was calculated as being US $5,518,094.80. In or about April 2009 Flame commenced an action in London to recover the amounts due and owing under the Agreement.

6. On June 18, 2009, the High Court of Justice, Queen's Bench Division, Commercial Court Registry entered a Judgment for Flame as against Primera and ordered that the defendant pay Flame a total of USD $5,554,271.36. *Attached hereto as Exhibit 2 is a copy of the Judgment for Claimant issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry, London, England.*

7. Pursuant to the Order issued by the High Court of Justice, Queens Bench Division, Commercial Court Registry, Defendant Primera is obligated to pay Flame $5,518,094.80.

8. The Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry is a final judgment, conclusive and enforceable in England.

9. Flame, having obtained a Judgment against Primera in the High Court of Justice, Queens Bench Division, Commercial Court Registry, now seeks confirmation of the Judgment by this Court and respectfully requests that this Court enter Judgment thereon.

**WHEREFORE,** Plaintiff prays:

1. For an Order pursuant to New York's Uniform Foreign Money Judgments Recognition Act, codified in New York's C.P.R.R. Article 53, recognizing and confirming the foreign Judgment rendered in favor of Flame S.A. and against Primera Maritime (Hellas) Limited in the High Court of Justice, Queen's Bench Division Commercial Court Registry of London, England in the amount of US $5,554,271.36, plus interest at a rate of eight (8) percent from June 18, 2009.

2. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
    September 23, 2009

Bennett, Giuliano, McDonnell & Perrone, LLP
Attorneys for Plaintiff
FLAME S.A.

William R. Bennett, III
494 Eighth Avenue, 7th Floor
New York, New York 10122
Telephone: (646) 328-0120
Facsimile: (646) 328-0121
wbennett@bgmplaw.com

## ATTORNEY VERIFICATION

WILLIAM R. BENNETT, III, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Bennett, Giuliano, McDonnell & Perrone, LLP, attorneys for plaintiff in this action, I have read the foregoing Petition to Enforce Foreign Judgment Pursuant to the Uniform Foreign Money-Judgments Act and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the plaintiff is because the plaintiff is a foreign entity, none of whose officers are presently within this Judicial district

Sworn to on September 23, 2009

_____
ERIKA M. ACHTZIGER
Notary Public, State of New York
No. 02AC6199189
Qualified in SUFFOLK County
Commission Expires 1/05/2013

_____
William R. Bennett, III

Z:\Casework\D Cases\D966 Flame v. Primera Maritime\VerComp-030509.doc

4

# EXHIBIT 1



# IFCHOR S.A.

SH PBRCKFER A CHAFFER NG AGENTS

SECURITIES & FFA DIVISION
PLACE PÉPINET 1 – CTH-1003 LAUSANNE, SWITZERLAND
TEL. +41 21 310 3131 – FAX +41 21 310 3100
E-MAIL: securities@ifchor.ch

## FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ("FFABA")

## FORWARD FREIGHT AGREEMENT FFABA 2007 TERMS

**Trade Ref:**      8.9011.7. MeRa.TC/Ifchor
**Contract Date:**  Thursday, September 11, 2008

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

**Seller**
**Flame S.A., Lugano Paradiso**
Via San Salvatore 13
6902 Lugano – Paradiso
Tel N. + 41 91 985 2072
Fax N. + 41 91 980 9401
Email. info@flamesa.ch
P.I.C. Luca Ferrari

        and

**Buyer**
**Primera Maritime (Hellas) Ltd.**
106, Ag.Orous Street
185 46 Piraeus
Tel N. +30 210 6207 220
Fax N. +30 210 620 2128
Email. pcoronis@primera.gr
P.I.C. Paul Coronis

The agreement between the parties set out in this Confirmation is a Confirmation pursuant to the Master Agreement.

1

In this Confirmation, "**Master Agreement**" has the meaning given to it in clause 9 if that clause applies, and if it does not, means any master agreement by which the Transaction entered into pursuant to and in accordance with this Confirmation is governed.

Until superseded by notice information in a subsequent Confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Confirmation may be properly served.

The terms of this Confirmation are as follows:

1) **Contract Route(s):**

As per the arithmetical average of the **Routes 1A, 2A, 3A and 4** [Transatlantic TC Round Voyage, TC Trip Out, Transpacific TC Round Voyage, TC Trip Back] of the **Baltic Panamax Index** as defined by the Baltic Exchange on the Contract Date and any route replacing or substituting that route subsequently published by the Baltic Exchange on or before the Settlement Date and with effect from the date of such replacement or substitution.

2) **Contract Rate:** USD 43'750.00 per day

3) **Contract Quantity:** 182.5 days (see below)

4) **Contract Months:** January 2009 (15.5 days) - February 2009 (14 days) - March 2009 (15.5 days) - April 2009 (15 days) - May 2009 (15.5 days) - June 2009 (15 days) - July 2009 (15.5 days) - August 2009 (15.5 days) - September 2009 (15 days) - October 2009 (15.5 days) - November 2009 (15 days) - December 2009 (15.5 days)

5) **Settlement Date:**

The last Baltic Exchange Index publication day of each Contract Month.

6) **Settlement Rate:**

(a) Each settlement rate (the "**Settlement Rate**") shall be the unweighted average of the rates for the Contract Route(s) published by the Baltic Exchange over each Settlement Period (defined as all Baltic Exchange Index publication days of each applicable Contract Month up to and including the Settlement Date).

2

(b)     If for any reason the Baltic Exchange cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the "**Panel**") to determine an appropriate rate, which determination will be final and binding on both parties.

(c)     Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d)     The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Exchange and its members and the FFABA and its members (the "**Indemnified Persons**") against all liabilities, actions, demands, costs and expenses incurred by any of them arising directly or indirectly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e)     As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

## 7)     Settlement Sum:

The "**Settlement Sum**" is the difference between the Contract Rate and the Settlement Rate multiplied by the Quantity by Contract Month. If the Settlement Rate is higher than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is lower than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

## 8)     Payment Procedure and Obligations:

(a)     Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or five (5) London business days after the Settlement Date and for this purpose a "**London business day**" means a day (other than a Saturday or Sunday) on which commercial banks are open for business in London) . The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

(b)     Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The costs incurred in effecting payment shall be for the account of the payer. Payment may only be effected directly between the parties. The Settlement Sum shall be paid without any deduction or set-off except as permitted pursuant to the Master Agreement or otherwise as agreed by the Buyer and the Seller in writing.

3

9) **ISDA Master Agreement:**

This clause 9 applies only if either:

(i)    this Confirmation does not already constitute a Confirmation under an existing master agreement entered into by the parties to this Confirmation; or

(ii)   the parties agree, either by virtue of clause 20 or otherwise, that the terms of the Master Agreement that is constituted by this clause are to replace any such existing master agreement.

This Confirmation constitutes and incorporates by reference the provisions of the 1992 ISDA® Master Agreement (Multicurrency – Cross Border) (without Schedule) as if they were fully set out in this Confirmation and with only the following specific modifications and elections:

(a)    Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

(b)    Seller is the Calculation Agent except where the Seller is the Defaulting Party in which event Buyer is the Calculation Agent;

(c)    the most current published set of ISDA® Commodity Definitions and ISDA® Definitions shall apply;

(d)    Credit Event Upon Merger is applicable to both parties;

(e)    for the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f)    Automatic Early Termination will apply to both parties;

(g)    the Termination Currency is United States dollars;

(h)    the Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly;

(i)    Local Business Day or banking day shall each refer to such a day in London;

(j)    such other modifications as shall be necessary for such incorporation;

4

(k)     references to "this Master Agreement", "this Agreement", "herein" and other like expressions shall be construed as being references to this Confirmation incorporating such provisions,

and this Confirmation, including such incorporated provisions, shall govern the Transaction referred to in this Confirmation and any other Transaction referred to in clauses 20 and 21.

The agreement constituted and incorporated by the incorporation of the provisions of the 1992 ISDA® Master Agreement (Multicurrency - Cross Border) (without Schedule) pursuant to this clause is referred to in this Confirmation as the **"Master Agreement"**.

## 10)     Capacity and Good Standing:

In line with and in addition to (as appropriate) the representations contained in Section 3 of the Master Agreement, each party represents to the other party that:

(a)     it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b)     it has the power to execute, deliver, and perform this Confirmation;

(c)     all governmental and other consents that are required to have been obtained by it with respect to this Confirmation have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d)     in the event that a party to this Confirmation is a person organized under, domiciled in, or having its principal place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in § 1a(12) of the Commodity Exchange Act (7 U.S.C. § 1a(12), as amended).

## 11)     Telephone Recording:

Each party consents to the recording of telephone conversations in connection with this Confirmation.

## 12)     Commission:

Each of the parties agrees to pay brokers' commission to any broker (a **"Broker"**) as agreed with any Broker.

## 13)     Non-Assignability:

5

Except as provided in Section 7 of the Master Agreement, this Confirmation is non-assignable unless otherwise agreed in writing between the parties to this Confirmation.

## 14) Principal To Principal:

This Confirmation is a principal to principal agreement with settlement directly between the two parties. Both parties agree that **Ifchor SA** shall be under no obligation or liability in relation to this Confirmation. Both parties agree jointly and severally to indemnify and hold harmless **Ifchor SA** against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

## 15) Law and Jurisdiction:

This Confirmation shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Master Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

## 16) Entire Agreement:

This Confirmation and the Master Agreement set out the entire agreement and understanding of the parties with respect to the subject matter of this Confirmation and supersede all oral communication and prior writings with respect thereto.

## 17) Payment Account Information:

**For Seller:**
Bank address:

**For Buyer:**
Bank address:

HSBC BANK PLC, PIREAUS, GREECE
IBAN: GR29 071 0001 0000 001 008374 071
ACCOUNT NO.  001 008374 071
BIC: MIDL GR AA
FAVOUR: JPC INVESTMENTS S.A.
RE: PRIMERA TRADE

6

## 18) Third party rights

(a) Unless provided to the contrary in this Confirmation, a person who is not a party to this Confirmation has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Confirmation.

(b) Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 6(d) in the case of any Indemnified Person and clause 14 in the case of any Broker.

(c) Notwithstanding any term of this Confirmation, the consent of any person who is not a party to this Confirmation is not required to rescind or vary this Confirmation.

## 19) Partial Invalidity

If, at any time, any provision of this Confirmation or the Master Agreement is or becomes illegal, invalid or unenforceable in any respect under any laws of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality or enforceability of the provision under the laws of any other jurisdiction will in any way be affected or impaired.

## 20) Inclusion of historical Confirmations under Master Agreement

(a) **Unless the parties to this Confirmation specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.**

(b) This clause 20 applies to this Confirmation and to every agreement entered into between the parties to this Confirmation (and no other persons) before the date of this Confirmation that is in respect of a forward freight swap, option or derivative:

   (i) that is expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms, the FFABA 2005 terms or the FFABA 2007 terms, with or without amendment; and

   (ii) in the case of a Confirmation that is stated to be subject to, or subject to substantially the same terms as, the FFABA 2007 terms that does not incorporate a clause substantially in the same form as this clause 20.

(c) Each agreement to which this clause 20 applies shall be treated as a Confirmation under the Master Agreement constituted pursuant to clause 9 as if such agreement had been entered into between the parties on the terms of the Master Agreement on the date of the first such Confirmation.

7

(d) If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a Transaction to which this clause 20 applies, the provisions of the agreement constituting the Transaction to which this clause 20 applies will prevail for the purposes of the Transaction under such agreement.

(e) This clause 20 shall not affect any rights or obligations of the parties under any Transaction accrued before the date of this Confirmation.

(f) This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such Transaction.

21) **Inclusion of subsequent Confirmations under Master Agreement**

(a) **Unless the parties to this Confirmation specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.**

(b) This clause 21 applies to every Confirmation that is in respect of a forward freight swap, option or derivative entered into between the parties to this Confirmation (and no other persons) subsequent to an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 9) having been entered into by them.

(c) Each such subsequent Confirmation shall constitute a Confirmation under the Master Agreement on the terms of clauses 20(c), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.

Signed for the Seller by                          Signed for the Buyer by

.................................................                 .................................................
Duly Authorized Signatory                         Duly Authorized Signatory

8

# EXHIBIT 2



Neutral Citation Number: [2009] EWHC 1973 (Comm)

Claim No: 2009 Folio 426

**IN THE HIGH COURT OF JUSTICE**
**QUEENS BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Friday, 31st July 2009

Before :

**HIS HONOUR JUDGE CHAMBERS QC**
**sitting as a judge of the High Court**

- - - - - - - - - - - - - - - - - - - -

Between :

**FLAME SA**                                                    **Claimant**
- and -
**PRIMERA MARITIME (HELLAS) LTD**             **Defendant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

Robert Bright QC (instructed by **Winter Scott**) for the Claimant
Chris Smith (instructed by **DLA Piper UK LLP**) for the Defendant

Hearing date : 15th July 2009

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................
HHJ Chambers QC

**HHJ Chambers QC :**

**Introduction**

1.     The Claimant trades in coal on an extensive basis. As part of its trading activities, on 11 September 2008 it entered into a Freight Forward Swap Agreement with the Defendant ("the Agreement"). The Agreement was governed by the 1992 ISDA Master Agreement (Multicurrency-Cross Border) ("the ISDA Master Agreement").

2.     The Defendant failed to make the payment in respect of January 2009 Contract Month, in the sum of US$ 609,963.20 which became due and owing on 2 February 2009. A Notice of Default was not met within three London business days of its service on 19 February 2009. By a letter dated 26 February 2009 the Claimants purported to bring the Agreement to an end with a consequential obligation on the Defendant to make payment pursuant to Section 6 of the ISDA Master Agreement. The sum was calculated as being US$ 5,518,094.50. The money was not paid and the Claimant started this action for its recovery.

3.     The proceedings, including particulars of claim, were served on the Defendant in Greece on 27 April 2009. On 12 May 2009 the Defendant filed an acknowledgement of service which indicated the Defendant's intention to dispute the Court's jurisdiction. Such an application had to be made within 28 days of filing the acknowledgement of service, namely 9 June 2009 (CPR r. 58.7(2)). On 8 June 2009 the Defendant informed the Claimant that there would be no challenge to the jurisdiction. The undoubted consequence of this was that the stay afforded by CPR Part 11 during the duration of a challenge to the jurisdiction did not apply.

4.     Greece is a Member State. The Claimant says that the situation was governed by CPR r. 6.35(3) of which the relevant provisions read as follows:

> "(3) Where the claimant serves the claim form on a defendant in ... a Member State under rule 6.33, the period –
>
> ...
>
> (b) for filing a defence is –
>
> ...
>
> (ii) where the defendant files an acknowledgement of service, 35 days after service of the particulars of claim."

5.     The application of the above provision resulted in time for the defence expiring on 1 June 2009. Thus, if the Claimant is correct, the Defendant's decision on 8 June not to proceed with a challenge to the jurisdiction without at the same time serving a defence, rendered it immediately susceptible to judgment being entered in default.

6.     The Defendant's indication of the decision not to proceed with the challenge was contained in an email from Mr Choo of its solicitors which read:

> "…
>
> In the light of your comments below, our clients will submit to the jurisdiction of the High Court. The Defendants will now be filing their defence in the action.
>
> Please confirm that the deadline for filing of the Defence will be 7 July 2009 in the light of the above concession and we shall write to the Court advising them of the same.
>
> …"

7.     Late the following day, 9 June 2009, Mr Britton of the solicitors for the Claimant responded by email as follows:

> "We note that it is no longer your Clients' intention to challenge jurisdiction. As far as we can see, CPR 6.35(3)(b)(ii) applies and your Clients' Defence was due on 1st June, unless you can point us to a rule that says otherwise.
>
> We do not see why your Clients should be able to take advantage of their misguided attempt to set aside service and have an additional 4 weeks to serve their Defence on top of the 6 weeks they have already had. Our Clients are prepared to grant your Clients an extension until close of business this Friday (12th June) to serve their Defence, but only until then."

8.     On 12 June 2009, Mr Choo sent the following email:

> "…
>
> The CPR makes no provision for time for service of Defence following a Defendant's challenge to the jurisdiction. This is because following an unsuccessful challenge to the jurisdiction, the Court usually makes further orders for the re-filing of the acknowledgement of service.
>
> Our clients have considered the issues you have raised regarding jurisdiction and have agreed to submit to the jurisdiction. However, the Defendants will need time to file the Defence and therefore request that you re-consider allowing our clients a period of 4 weeks from the date of our e-mail of 8 June to so do. Much of the evidence that we will need to collate in preparation of the defence is outside the jurisdiction."

9.      In an email dated 12 June, Mr Britton rejected all Mr Choo's contentions and concluded with the words, *"Unless by close of business today you provide a proper explanation why [the Defendants] need this extra time, we will apply for Default Judgment to be entered against your Clients"*.

10.     In an email dated 15 June 2009 Mr Choo indicated the nature of the defence that would be advanced, namely that the Claimant's position was one of default that fell within Section 5 (a)(vii)(2) of the ISDA Master Agreement and requested agreement to an extension until 29 June, *"failing which we shall apply to the Court for an extension ..."*.

11.     No extension was agreed and judgment in default for US$ 5,554,271.36 was entered on 18 June 2009. On 19 June 2009 the Defendants served their defence relying on the ISDA Master Agreement which provides as follows:

> "**2. Obligations**
>
> (a) *General Conditions*
>
> (iii) Each obligation of each party under Section 2(a)(i) [to make payment as claimed in this action] is subject to the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred or is continuing. (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition precedent specified in this agreement.
>
> ...
>
> **5. Events of Default and Termination Events**
>
> (a) *Events of Default.* The occurrence at any time with respect to a party ... of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:-
>
> ...
>
> (vii) *Bankruptcy.* The party ...
>
> ... (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due.
>
> ..."

12.     The defence asserted that as at 2 February 2009, the Claimant had failed to pay its debts as they fell due and/or that it was unable to pay its debts as they fell due. Particulars were given to which I shall come in due course.

13.    On 24 June 2009 the Defendant applied to have judgment set aside.

**Time for service of the defence**

14.    Insofar as the time for service of the defence is concerned, the Defendant's position is stated in paragraphs 17 and 18 of the skeleton argument of its counsel, Mr Chris Smith. He says:

> "17.    It is … submitted that there is a lacuna in the CPR on this point. Hence, at the time when the Claimant entered judgment, the time for expiry of the Defence could not have elapsed and so the Claimant was not in fact entitled to enter judgment. Accordingly that judgment *must* be set aside pursuant to CPR 13.2.
>
> 18.    If the Defendant's analysis is wrong on this point, it is submitted that the CPR is, at the very least, ambiguous as to when the Defence has to be filed. In such circumstances, that ambiguity constitutes a good reason why judgment *should* be set aside pursuant to CPR 13.3(1)(b)."

15.    The difficulty with Mr Smith's argument is that for there to be a lacuna there must be an omission and for there to be an ambiguity there must be an alternative. Insofar as it was suggested that there was an omission, one was faced with the consequence that a defendant who abandoned a challenge to the jurisdiction was under no obligation to serve a defence at any particular time. Insofar as it was suggested that there was ambiguity, no alternative process to CPR r 6.35(3)(b)(ii) was put forward for ascertaining the date by when a defence was to be filed where a challenge was abandoned. The best that could be said was that, where a challenge was pursued and failed, CPR r 11.1(7) made special and satisfactory provision.

16.    The difficulty with both the above arguments is that the rules are clear. Where a defendant in the commercial list has expressed a wish to challenge the jurisdiction it enjoys the protection afforded by CPR r.58.7(2). If the challenge is not pursued, the protection ceases. Clearly those responsible for drafting Part 58 were not oblivious to the provisions of CPR r.6.35 because it receives express mention at CPR r.58.10(2), albeit in a different context.

17.    There is no difficulty in understanding the position created by the extension of time to challenge the jurisdiction from the 14 days allowed by CPR r.11.4. The clear consequence of the use of the full 28 day period in which to make a challenge to the jurisdiction in conjunction with the 21 days allowed for filing an acknowledgement of service is that the 35 days allowed for service of the defence after service of the particulars of claim will have expired. Some might find the situation anomalous, though it may fairly be said that the 21 days plus 14 days afforded where a case is not in the commercial list are hardly an improvement in practice, the defence being due on the same day as the right to challenge lapses.

18.  As the present case illustrates, whatever the difficulties in theory, there should be few, if any, in practice. Faced with the imminent requirement to serve a defence and the need to have time to do so, whether by agreement or order, a defendant should seek an extension of time. In the present case the Defendant was greedy and the Claimant grudging in fixing upon a suitable period. At that moment the Defendant should have sought an order from the court. It did not do so and judgment was entered against it. Nevertheless, a tactical misjudgment of that sort should not deprive a defendant of the opportunity to fight a case where there is a real prospect of successfully defending the claim and I now turn to that question.

## Liability

19.  The Defendant says that it has a real prospect of establishing that, at the time of the alleged default, the Claimant fell within the 'bankruptcy' provision in the ISDA Master Agreement that I have set out and was thereby relieved from making the payment, the non-payment of which triggered this action.

20.  The Defendant relies upon three matters:

    i)  The failure of the Claimant to pay US$ 1,011,010.06 claimed by Pioneer Freight Futures Co. Ltd BVI ("Pioneer") in proceedings issued against the Claimant in this court on 19 January 2009.

    ii)  The failure of the Claimant to pay Agrenco Madeira Comercio Internacional Lda ("Agrenco") US$ 9,044,739.71 said to have become due and owing on 5 January 2007.

    iii)  The general financial position of the Claimant when the January payment would otherwise have fallen due, namely 2 February 2009.

21.  It is self-evident that it is not my task to determine the validity of the Pioneer and Agrenco claims and I say nothing about their respective facts and merits. For present purposes it is agreed by all concerned that each raises a serious issue to be tried that is *bona fide* disputed by the Claimant but has the potential to be decided against it with the consequence that at some time in the future it may be found that one or both of the sums was due, owing and unpaid by the Claimant on 2 February 2009. Do these assumptions present the Defendant with a real prospect of success in its 'bankruptcy' defence?

22.  The answer to the above question is one of pure construction. Furthermore, given the nature of the agreement in question, there is no call for the sort of factual investigation often used as a tool in finding the meaning of one off contracts.

23.  The relevant provision reads:

"(vii) *Bankruptcy*. The party ... :-

... (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due."

24.    Mr Robert Bright QC submits on behalf of the Claimant that, as a matter of pure grammar, the failure in question must be one generally to pay debts as they become due. Mr Smith submits that the insertion of a comma before 'admits' and after 'generally' neatly corrals the phrase in a way that assists his case.

25.    However both parties eschew such dry parsing and mainly invite me to treat the matter as one of general analysis against the overall background of the ISDA Master Agreement, the Defendant emphasising that all that it need show is a real prospect of success for its interpretation.

26.    Nevertheless, I think it fair to start with grammatical analysis, not least because although those responsible for drafting important documents can get it wrong, one may start in the modest expectation that the words say what the draftsmen want them to say.

27.    There are, of course, no commas in the relevant passage. The use of the disjunctive 'or' serves as a form of punctuation. However, the word 'fails' standing by itself between two 'ors' can carry no meaning. The meaning is supplied by the words at the end of the passage. I can see no good reason for excluding the word 'generally' from those concluding words. However, to my mind such niceties give way to the overwhelming effect of the wording of Section 5(a)(vii) of which the provision now in question is only a small part.

28.    The clear effect of the various provisions listed in the Section is to cover and only to cover situations redolent of insolvency and, furthermore, to exclude situations where the relevant allegations have not been successfully maintained. All these provisions appear under the heading *'Bankruptcy'*. Nowhere is there anything to describe the situations constituted by the Pioneer and Agrenco matters, the one an unresolved action and the other a bare claim.

29.    I hold that there is no real prospect of the Defendant resisting the present claim by reliance on the either or both of the Pioneer and Agrenco matters.

30.    Could the Claimant pay its debts as at 6 February 2009?

31.    The Claimant's management accounts for the quarter ending 31 March 2009 show a profit after tax for that quarter of US$ 657,221.20, retained earnings of US$ 69,793,933.52 and shareholder's equity of US$ 69,795,219.56. These figures speak

for themselves. I am also told and have no reason to doubt that the Pioneer and Agrenco claims were the subject of provision in the 2008 accounts.

32.     I hold that the defence on the merits has no real prospect of succeeding and that the judgment in respect of the merits must stand. Nevertheless, the Defendant contends that the sum claimed is wrongly calculated because it is based on a non-existent market.

33.     The Claimant calculates its claim on the basis of Section 6(e)(i)(4) of the ISDA Master Agreement which reads:

> "*Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement ..."

34.     "Loss" is defined in a lengthy passage in the definitions clause at Section 14. For present purposes it is to the effect that the Claimant may, acting *bona fide*, determine its loss by reference to quotations of relevant rates and prices from one or more leading dealers in the relevant markets.

35.     The ISDA Master Agreement governs contracts for differences. It has a well established commercial use. The Agreement is dated 11 September 2008. It relates to the whole of 2009. The Claimant wished to protect itself against an overall softening in freight rates in that year. The Defendant agreed to assume that risk against its expectation that the relevant rates would harden. The Defendant was wrong.

36.     Now the Defendant asserts that so badly was it wrong that it is not open to the Claimant to recover its loss by the use of the mechanism afforded by the ISDA Master Agreement.

37.     The Claimant is a trader. It is committed to paying very large sums of freight. The accounts for the year ended 31 December 2008 show a figure of US$ 284,364,477. To protect itself, in some part, against adverse market movement it entered into the Agreement. Absent payment by the Defendant, it will suffer a loss because it will be paying freight at rates that exceed those now being charged.

38.     The compensation mechanism in the ISDA Master Agreement is simply a means of calculating what, at the relevant date, would be the cost of obtaining a precisely similar arrangement to that concluded with the defaulter for the outstanding period of the original swap agreement. As time goes by, so it is possible to see what the actual position has been as against the prospective calculation provided by the ISDA Master Agreement.

39.     Despite my invitation, the Defendant has offered no alternative figure or method of calculation against that of the Claimant. Indeed, until shortly after the beginning the

present hearing, the Defendant did not admit the amount of the January settlement figure.

40. There is no dispute that the Claimant has acted *bona fide* in its calculation of its loss. There is no dispute that a quotation has been given by a leading dealer in the relevant market. There is no dispute as to the amount of the claim as calculated by reference to the quote. The allegation is that, on no view, can the calculation be correct because there was no relevant market. If the Defendant wishes to pursue that allegation it must pay to the Claimant, with interest, any balance that would now be due to the Claimant in the event that the Agreement had continued and bring into court or provide security for a sum equal to the Claimant's loss as calculated under the ISDA Master Agreement for the remainder of the term of the Agreement from the last date to which the payment to be made to the Claimant relates.

## Conclusion

41. Save that the Defendant will be at liberty to contest the amount due to the Claimant in the event that the conditions set out in paragraph 39 are met, the judgment will stand.

42. No one need be present at the handing down of this judgment. All consequential matters will be dealt with at a time and in a manner convenient to the parties and that hearing will be treated as an adjourned hearing of the one at which this judgment has been handed down.

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**HIS HONOUR JUDGE CHAMBERS QC**
**sitting as a judge of the High Court**

BETWEEN:

FLAME SA

Claimant

- and -

PRIMERA MARITIME (HELLAS) LTD

Defendant



13 AUG 2009

## ORDER 12TH AUGUST 2009

UPON READING the First Witness Statement of Linos Choo dated 23rd June 2009, the Second Witness Statement Graeme Lloyd 8th July 2009 and the First Witness Statement of Sally Louise Cook dated 14th July 2009

AND UPON HEARING Counsel for the Defendant and Leading Counsel for the Claimant

IT IS NOW HEREBY ORDERED THAT:

1. The Defendant's application by application notice dated 24th June 2009, for judgment in default to be set aside is dismissed.

2. The judgment in default granted against the Defendant on 18th June 2009 in the sum of US$5,554,271.36 should stand as final judgment against the Defendant and shall be enforceable on 4th September 2009 in the sum of US$5,554,271.36, together with interest

thereon from 18th June 2009 at the Judgment Rate of 8%, unless the Defendant shall by 14th August 2009 make payment to the Claimant in the sum of US$2,960,249.48 and shall also by 2nd September 2009 make payment into Court in the sum of US$2,594,021.88.

3. The Defendant shall pay the Claimant's costs of the action, to be assessed if not agreed, and shall make a payment on account in the sum of £10,000 by 2nd September 2009.

4. The Defendant's application for permission to appeal is refused.

Dated the 12th day of August 2009